COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

                                        NO.
2-04-156-CR

 

MICHAEL JAROD POGUE                                                      APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE 

 

                                              ------------

 

             FROM
THE 16TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

                           Introduction & Procedural
Background








Michael Jerod Pogue appeals
from his conviction for aggravated sexual assault of a child under
fourteen.  In ten points, appellant (1)
challenges the legal sufficiency of the evidence to support his conviction and
complains that the trial court (2) improperly denied his motion for new trial,
(3) improperly excluded certain evidence, (4) erroneously overruled his motion
for mistrial based on improper prosecutorial jury argument, (5) improperly
denied his challenge for cause of a veniremember, (6) misstated the definition
of reasonable doubt in the jury charge, (7) erroneously allowed the State to
ask prospective jurors commitment questions during voir dire, (8) imposed a
sentence that constitutes cruel and unusual punishment, (9) coerced the jury
into returning a verdict, and (10) improperly denied his motion to sever the
six-count indictment.  We affirm.

Appellant was tried and convicted
for the sexual assault of his twelve-year-old daughter, B.P.  Appellant was charged with one count of
indecency with a child and five counts of aggravated sexual assault of a child.  A jury found appellant not guilty of all but
one count of aggravated sexual assault. 
The jury assessed punishment, enhanced by two prior felony convictions,
at ninety-nine years=
confinement. 

                                 Motion for Instructed Verdict

In his first point, appellant
complains that the trial court improperly overruled his motion for an
instructed verdict because the evidence is insufficient to support the jury=s verdict of guilty on the one aggravated sexual assault offense for
which he was convicted.  Appellant
asserts that B.P. was not a credible witness because of her conflicts with her
parents and her reputation for being untruthful and that B.P.=s half-brother G.B., who testified to observing the assault, could not
be precise regarding when the assault occurred. 








A challenge to the denial of
a motion for instructed verdict is actually a challenge to the legal
sufficiency of the evidence.[2]
 In reviewing the legal sufficiency of
the evidence to support a conviction, we view all the evidence in the light
most favorable to the verdict in order to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.[3]









This standard gives full play
to the responsibility of the trier of fact to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts.[4]  The trier of fact is the sole judge of the
weight and credibility of the evidence.[5]  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the fact finder.[6]  We must resolve any inconsistencies in the
evidence in favor of the verdict.[7]  The standard of review is the same for direct
and circumstantial evidence cases.[8]


To establish that appellant
committed the assault for which he was convicted, the State had to prove that
appellant intentionally or knowingly caused B.P.=s sexual organ to contact appellant=s sexual organ or caused the penetration of B.P.=s sexual organ by appellant=s sexual organ, and that B.P. was a child under fourteen who was not
appellant=s spouse.[9]  A child victim=s uncorroborated testimony is sufficient to support a conviction for a
sexual offense.[10]

B.P. was thirteen years old
when she testified at trial.  She
testified as follows:  During the
previous year, appellant had put his penis Aon@ or Ain@ her vagina
five or six times.  On at least one
occasion, appellant had gotten on top of her, put his penis in her vagina, and
moved up and down.  Once, when B.P. tried
to close her legs, appellant said, AOpen up for Daddy.@  Appellant had also Alicked [B.P.=s] vagina@ once or twice. 








These events occurred at
night, either in the living room or in B.P.=s bedroom, which she shared with her grandfather.  B.P.=s grandfather did not wake up, but B.P.=s mother, who was pregnant and sleeping in another room, sometimes got
up to use the restroom.  When she did,
appellant would leave B.P.=s bedroom and go to her mother=s bedroom. 

During the time these events
were occurring, in late April 2003, B.P., who was usually an A-B student,
received a report card with Aa bunch of C=s@ on it.  B.P.=s brother G.B. said that it was not normal for B.P. to receive such
low grades, that he Aknew what
was going on,@ and that he
would tell their mother unless B.P. did. 
When B.P. did not report the incidents to her mother, G.B. told their
grandfather who, in turn, told their grandmother.  B.P. then told her grandmother, aunt, and
uncle about the assaults, and they took her to the hospital. 








At the hospital, B.P. was
interviewed by Denton Police Officer Virginia Nichols.  Officer Nichols testified that B.P. was Apretty upset@ and,
although Avery
reluctant@ to talk to
her at first, eventually alleged that she was the victim of ongoing sexual
assaults.  B.P. reported that the most
recent assault had occurred the day before but had just involved fondling.  Because Officer Nichols did not believe any DNA
evidence would be present after fondling and because no sexual assault nurse
examiner (SANE) was immediately available, no medical examination was conducted
at that time.  Instead, Officer Nichols
took B.P. to the police station so Detective Brian Lee could continue the
investigation.       A week later, B.P.
was examined by SANE Lorna Doan.  Doan
testified that B.P. reported that appellant had, on more than one occasion,
inserted his fingers and penis into her vagina, licked her vagina, and touched
her breasts. During her examination, Doan found no evidence of trauma to the
labia majora, labia minora, or the vagina. 
She further testified, however, that transsections of B.P.=s hymen showed that she had been penetrated into the vagina with
something large enough to tear the hymen and that the tears were consistent
with the history that B.P. gave of her father having intercourse with her on
more than one occasion.   Doan could not
pinpoint the exact age of the tears but she testified that the tears were
healed, which indicated that they had occurred over a week, and probably at
least two weeks or more, before the date of the examination.[11]









Finally, B.P.=s eleven-year-old brother, G.B., testified that appellant went into
B.P.=s bedroom every time appellant and B.P.=s mother had an argument. G.B. further testified that, one night while
everyone was asleep, he saw appellant get on top of B.P. in the living room and
begin moving his body up and down.  G.B.
later told B.P., AI seen what
happened,@ and told
her that they should tell their mother that appellant was Ahumpin=@ B.P.  G.B. testified that B.P.
told their grandmother because he had said he would tell if she did not.[12]

From this evidence, the jury
could have found the essential elements of the charged offense beyond a
reasonable doubt.[13]

There is also contrary
evidence.  For example, appellant testified
that he had never assaulted B.P., and he described B.P. as rebellious and angry
over the discipline she had received for making poor grades.  B.P.=s mother Katrina also testified that B.P. never mentioned the alleged
assaults until the day she was disciplined over her report card.  Katrina confirmed that B.P. did not like
being disciplined, especially by appellant. 
In addition, appellant=s sister testified that B.P. had a bad reputation for being
untruthful.








Further, B.P. acknowledged on
cross-examination that she had first told her grandparents about the alleged
assaults on the same day that she was disciplined for receiving a poor report
card and that her mother knew nothing about the alleged assaults until after
B.P. reported them to the police.  B.P.
also admitted lying to appellant about her report card for fear of being
punished for it, and she admitted she had told Detective Lee that she was upset
with appellant over being disciplined and not being able to go to the
movies.  B.P. further acknowledged that
she wanted to go live with her grandmother due to tension between her and her
parents over some of her friends.  In
addition, B.P. admitted that there were discrepancies between her trial
testimony and the written statement she had given Detective Lee.  For example, contrary to her trial testimony,
B.P. had told Detective Lee that G.B.=s response to her allegations of sexual assault was, AYou=re lying to
me.@








Although there are some
conflicts in the evidence, they were for the jury to resolve.[14]  When performing a legal sufficiency review,
we may not re-evaluate the weight and credibility of the evidence or substitute
our judgment for that of the fact finder.[15]  Accordingly, because the evidence is legally
sufficient to support the jury=s verdict, we hold that the trial court did not err by overruling
appellant=s motion for
an instructed verdict.  We overrule
appellant=s first
point.

                                      Motion for New Trial

In his second point,
appellant complains that the trial court violated his constitutional right to
due process by improperly overruling his motion for new trial, which was based
primarily on B.P.=s total
recantation of her allegations against appellant. 

AA new trial
shall be granted an accused where material evidence favorable to the accused
has been discovered since trial.@[16]  Under this statute, a
defendant is entitled to have his motion for new trial granted if (1) the newly
discovered evidence was unknown to him at the time of trial;  (2) his failure to discover the new evidence
was not due to his lack of due diligence; 
(3) the new evidence is admissible and not merely cumulative,
corroborative, collateral, or impeaching; 
and (4) the new evidence is probably true and will probably bring about
a different result in a new trial.[17]








The trial court has
discretion to decide whether to grant a new trial based upon newly discovered
evidence, and its ruling will not be reversed absent an abuse of discretion.[18]  The trial court's discretion extends to
situations in which the newly discovered evidence is the retraction of a
witness's trial testimony.[19]  Likewise, the trial judge determines the
credibility of the witnesses and whether the new evidence is probably true.[20]









The Aprobably true@ requirement
simply means Athat the
whole record presents no good cause to doubt the credibility of the witness
whose testimony constitutes the new evidence, either by reason of the facts
proven at the trial or by the controverting affidavits on the motion, or
otherwise.@[21]  The trial court acts within
its discretion in disbelieving a recantation as long as the record provides
some basis for disbelieving the testimony.[22]  Such bases include, but are not limited to,
evidence that the recanting witness was subject to pressure by family members
or threats from co‑conspirators, evidence showing part of the recantation
to be false, circumstances showing that the complainant recanted after moving
in with family members of the defendant, and an accomplice=s recantation after being convicted.[23]


In this case, there is
evidence that B.P. was pressured by family members into recanting.  For example, the testimony of B.P.=s mother, Katrina, at the new trial hearing indicates that B.P. never
broached the subject of appellant=s alleged abuse with her mother; instead, the few conversations
between the two of them about the matter, including B.P.=s alleged recantation, were initiated by Katrina.  Katrina testified as follows:

I=ve
been asking her all the way through to talk to me, and do you want counseling?  And nothing. 
So I=m not
going to push her.  When she=s
ready she=ll
come.

 

. . . .

 

She
just didn=t
want to talk about it.  I extended myself
and she=s
justCI=m
assuming . . . but maybe she=s just not ready or she doesn=t
want to.  I don=t
know.

 

. . . .

 

She
really won=t
elaborate on it.  In the beginning, I was
upset and I really wanted toCI wanted answers.  And she would tell me, mama, I really don=t
want to discuss it.  I really don=t
want to talk about it.  And I responded
to her and I=d
tell her, I need to know. I need answers. 

 








Katrina further testified
that, on the two or three occasions that B.P. had agreed to discuss the matter
with herCAnever, never in a detail of any type@CB.P. had consistently stated that she wanted everyone to believe what
she had said in court.  Then, about three
weeks after appellant=s trial
ended, at Katrina=s birthday
celebration, she noticed that B.P. was being especially quiet and raised the
subject again.  She asked B.P., A[D]oes this have something to do with your dad=s recant?@  At that point, according to Katrina, B.P.
stated, A[H]e didn=t do it, but
I don=t want to go back to court.@  B.P. did not elaborate on this
statement. 

In light of all this
testimony, even defense counsel suggested to Katrina that she seemed to have
been putting pressure on B.P., which Katrina denied.   B.P. also testified at the hearing and stated that all of her
allegations and trial testimony against appellant regarding the alleged sexual
abuse had been false.  She testified that
she had made up the allegations because she was angry with appellant for Ashaming@ her and her
family by cheating on her mother and fathering Abrothers and sisters and people I didn=t even know about.@[24]  She stated, AThe reason I=m coming
forward and telling the truth is because I don=t think anyone should have to serve this time in jail for something
that he didn=t do.@ 








B.P. denied that anyone had
pressured her into recanting.[25]  She further testified, however, that when she
and the rest of her family went to visit appellant in jail after his
conviction, A[h]e really
didn=t even talk to me.  He talked to
my brothers and my mom.@  B.P. also testified that she and her brothers
missed her father, that her mother was sad and depressed,[26]
and that she knew her baby sister would never know their father.  She stated that she had decided to say she
had lied when she learned that her father had received a ninety-nine-year
sentence. 

There are also
inconsistencies in the record that tend to show the recantation to be
false.  For instance, Katrina testified
that B.P. told her, A[H]e didn=t do it, but I don=t want to go back to court.@  B.P., on the other hand,
testified that she told her mother, AHe didn=t do it,@ and AI told [my
mom] I would come back here and tell the truth.@ 








In addition, B.P. testified
at trial that she had told Detective Lee she was angry with her father over
being disciplined and upset over not being allowed to go to the movies or do
what she wanted to do.  This testimony is
inconsistent with B.P.=s stated
reason at the new trial hearing for her anger with her father:  that he had Ashamed@ her and her
family by cheating on her mother and fathering children with another
woman.  

Further, B.P. could name only
one sibling that appellant had fathered during his extramarital affair, a
year-old sister whose existence B.P. had discovered A[d]uring the middle@ of 2003, A[m]aybe a
little@ before summer.  The date of
this discovery appears to post-date B.P.=s outcry regarding the sexual abuse, which occurred on April 25, 2003.


Moreover, Katrina=s and B.P.=s testimony
regarding B.P.=s alleged
recantation did not account for some of the other evidence of appellant=s guilt that was presented at trial. 
B.P. testified at the new trial hearing that she had told her brother
G.B.CfalselyCthat her dad
had been touching her, that G.B. had then told their grandmother, Aand we ended up here in court.@  But  B.P. denied having any conversations with
G.B. about the case or telling him how to testify.  








B.P.=s alleged lie to G.B. is inconsistent with his trial testimony.  G.B. testified that he had seen appellant Ahumpin=@ B.P. one night and later approached her and threatened to tell
their mother if B.P. did not.  After
that, according to G.B., B.P. told their grandmother about the alleged
assaults.  G.B. also testified that he=d seen appellant go into B.P.=s bedroom every time appellant and Katrina had a fight. 

Finally, B.P. testified that
she would Atruly
disbelieve@ Nurse Doan=s trial testimony that her examination of B.P. showed her hymen had
been penetrated.  Although she claimed to
understand that penetration of her hymen meant she=d had some sort of sexual intercourse or sexual activity, B.P. flatly
denied that any penetration or sexual activity had occurred. 

At the close of the hearing,
the trial court denied appellant=s motion for new trial, finding that Athe circumstances of the recantation cast doubt on its validity.@  Specifically, the trial court
noted its reliance on Katrina=s and B.P.=s testimony
and demeanor at the new trial hearing, as well as everything that was presented
at trial.

For the reasons we have just
discussed, we hold that the trial court did not abuse its discretion by
disbelieving B.P.=s
recantation and concluding that it was probably not true.[27]  We overrule appellant=s second point.

                                        Excluded Evidence








In his third point, appellant
complains that the trial court deprived him of his constitutional right to a
fair trial by prohibiting him from presenting relevant and exculpatory evidence
to the jury regarding B.P.=s tendency to lie and her possible sexual activity with two of her
boyfriends.  Appellant contends that this
evidence undermined B.P.=s
credibility, demonstrated B.P.=s bias and her motive for making false accusations against him, and
provided a reasonable explanation for the State=s scientific evidence regarding the penetration of B.P.=s hymen. 

In response, the State sets
forth a thorough and detailed analysis, explaining each proffer of evidence by
appellant in the context of the witness who was on the stand; the basis upon
which each proffer was made; the trial court=s ruling and the basis for it, if mentioned on the record; the
evidence the jury was allowed to hear from each witness; and why the excluded
evidence was properly excluded.  The
evidence and the propriety of the trial court=s rulings are summarized below.








In a prosecution for
aggravated sexual assault, evidence of specific instances of an alleged victim=s sexual behavior is not admissible unless the evidence is necessary
to rebut or explain medical evidence offered by the State, relates to the
alleged victim=s motive or
bias, or is constitutionally required to be admitted.[28]  In addition, the probative value of the
evidence must outweigh the danger of unfair prejudice.[29]

The Sixth Amendment and Texas
Rule of Evidence 613 also protect a defendant=s right to cross-examine a witness regarding bias or motive.[30]  Therefore, a defendant is entitled to pursue
all avenues of cross‑examination reasonably calculated to expose a
motive, bias, or interest for the witness to testify.[31]  But the trial court has broad discretion to
limit cross-examination in order to avoid harassment, prejudice, confusion of
the issues, endangering the witness, the injection of cumulative or collateral
evidence, and marginally relevant interrogation.[32]








We review the trial court=s exclusion of evidence under an abuse of discretion standard.[33]  A trial court does not abuse its discretion
unless its ruling is arbitrary and unreasonable and therefore outside the zone
of reasonable disagreement.[34]  The mere fact that a trial court may decide a
matter within its discretionary authority in a different manner than an
appellate court would in a similar circumstance does not demonstrate that an
abuse of discretion has occurred.[35]

In this case, appellant
sought to introduce evidence regarding B.P.=s relationships with two different boys and her actions and comments
involving two cousins.  That evidence is
as follows:

In the summer or fall of
2002, B.P. had received a letter from a neighborhood boy named Larry, whom B.P.
considered to be her boyfriend.  At that
time, B.P. was eleven years old, and Larry was thirteen. 








In the letter, Larry
described how big his penis was, told B.P. he was going to give her some of his
Along dong,@ and said
that B.P. was scared to have sex with him. 
B.P. wrote back that Larry was Ajust a horn frog,@ that she was Anot scared
of it,@ that her Ap----@ would swallow him up, and that they did not have time for sex. 

When appellant and Katrina
discovered the letter, appellant Awhipped her,@ which B.P.
did not like.  In addition, B.P. was
grounded for two weeks.[36]
On cross-examination outside the jury=s presence, B.P. admitted receiving and responding to the letter, but
she denied having sexual intercourse or penile-vaginal contact with Larry. 








Next, appellant sought to
introduce evidence regarding B.P.=s relationship with a boy named Derek. 
At the time of trial, B.P., who was thirteen and in the seventh grade,
had a boyfriend named Derek who was in the tenth grade.  B.P.=s parents did not approve of Derek or of some of B.P.=s middle school-aged girlfriends because they were dating much older
boys.  Katrina testified that she and
appellant refused to allow B.P. to date Derek and told B.P. not to Ahang out@ with the
girlfriends whom they believed were a bad influence on her.  According to Katrina, B.P. was quite upset at
first but Acame to
terms with it@ after a
couple of weeks.  Katrina testified that
these events occurred before and during the first part of her pregnancy. 

Much later, in February 2004,
the month before trial, Katrina had taken B.P. to get a pregnancy test because
of a letter she had found in B.P.=s pocket which said that B.P. was pregnant by Derek and debating
whether she should tell him or keep it a secret.  B.P. denied having sexual intercourse or
penile-vaginal contact with Derek.  She
explained that the note was a joke and had been written by a girlfriend at
school.  Katrina testified that, based on
the handwriting in the letter, she had doubts about whether B.P. had written it
and did not believe that B.P. was actually pregnant.  But she took B.P. for a pregnancy test Ajust to assure myself.@ 

Appellant also sought to
introduce evidence regarding B.P.=s actions towards and conversation with two of her cousins.  B.P.=s cousin Tevin testified that B.P. had touched him more than once on
his private parts, including his penis, and it made him uncomfortable.  Tevin could not, however, remember when the
touching occurred, except that it Amay@ have
occurred Awithin the
last year or two.@ 








B.P.=s cousin Shonquinta testified that B.P. had told her of exchanging
notes with a boyfriend named William and had once stated, without elaboration,
that she=d had sex with him on a table at the park.  Shonquinta testified that B.P. made this
statement before appellant went to jail,[37]
but she could not remember exactly when. 

Finally, appellant sought to
introduce Katrina=s equivocal
testimony that B.P. can be trustworthy about a lot of things but will lie
sometimes, Asort of
depend[ing] on what the situation is.@  Regarding B.P.=s allegations against appellant, Katrina testified that she did not
know what to believe but wanted Aclosure.@ 

Over appellant=s objections, the trial court excluded all of this evidence.          This
evidence shows that the incident involving Larry occurred in the summer or fall
of 2002, several months before B.P.=s outcry in late April 2003 and her medical examination a week
later.  Moreover, neither the Aletter@ involving
Derek nor the pregnancy test occurred until well after the outcry and the
medical examination.  In addition,
neither of B.P.=s two
cousins testified that her alleged conduct involving them occurred before April
2003.  Thus, the trial court could have
determined, based on the chronology of these events, that they did not explain
the State=s medical
evidence regarding the penetration of B.P.=s hymen in approximately late April 2003.








Further, although the trial
court excluded Katrina=s equivocal
testimony about B.P.=s veracity,
B.P.=s aunt was allowed to testify that B.P. had a bad reputation for being
untruthful, and B.P. herself admitted lying to appellant about her report card.


For these same reasons, the
trial court reasonably could have concluded that these matters had, at best,
marginal relevance to B.P.=s alleged motive to testify falsely against appellant, that they would
have unduly harassed B.P. and confused the issues, and that the danger of
unfair prejudice from this evidence would have outweighed its probative
value.  Accordingly, we hold that the
trial court did not abuse its discretion or deprive appellant of his
constitutional right to a fair trial by excluding the contested evidence.  We overrule appellant=s third point.

                                        Motion for Mistrial

In his fourth point,
appellant complains that the trial court improperly denied his motion for
mistrial based on the following prosecutorial jury argument during the
punishment phase of trial:  A[B.P.] will be 45 years old some day, sitting on a jury panel, and
somebody will ask her about sexual assault, and she will start crying.@  Appellant contends that the
trial court=s
instruction to the jury to disregard this was insufficient to eliminate the
harm of the remark because the jury assessed his punishment at ninety-nine
years in prison. 








When
the trial court sustains an objection to jury argument and instructs the jury
to disregard but denies a defendant=s motion for a mistrial, the
issue is whether the trial court abused its discretion in denying the mistrial.[38]  Only in extreme circumstances, in which the
prejudice caused by the improper argument is incurable, i.e., Aso prejudicial that expenditure
of further time and expense would be wasteful and futile,@ will a mistrial be required.[39]  In determining whether the trial court abused
its discretion in denying the mistrial, we consider (1) the severity of the
misconduct (prejudicial effect), (2) curative measures, and (3) the certainty
of the punishment assessed absent the misconduct.[40]








Assuming, for argument=s sake, that the complained-of remark was improper, we hold that the
trial court did not abuse its discretion by denying a mistrial.  The remark was only one sentence in the State=s closing argument, and the trial court=s instruction to disregard was immediate.  Therefore, the trial court reasonably could
have concluded that the remark would have little prejudicial effect on
appellant.  Further, the gravity of the
offense, appellant=s
culpability, and his prior felony convictions all contributed to the certainty
of the punishment assessed, even absent the complained-of remark.[41]  Accordingly, we overrule appellant=s fourth point.

                                       Challenge for Cause

In his fifth point, appellant
complains that the trial court violated his constitutional right to an
impartial jury that could follow the law when it overruled his challenge for
cause to veniremember Douglas Brincks. 
Appellant asserts that Brincks=s answers during voir dire indicated that (1) he was biased or
prejudiced against the legal principle that a defendant=s failure to testify cannot be used against him and (2) he could not
be fair and impartial due to his personal experiencesCbeing concerned for his children in day care and having once dated a
woman who had been assaulted. 








A veniremember may be
challenged for cause if he has a bias against any of the law applicable to the
case upon which the defendant is entitled to rely.[42]  If a prospective juror is biased as a matter
of law, he must be excused when challenged, even if he states that he can set
aside his bias and provide a fair trial.[43]  But the trial court has discretion to
determine whether bias exists.[44]  A venireperson who has indicated that he may
hold a defendant=s failure to
testify against him can be rehabilitated.[45]  Thus, when a juror states he believes that he
can set aside any influences he may have, and the trial court overrules a
challenge for cause, its decision will be reviewed in light of all of the
answers the prospective juror gave.[46]

In this case, Brincks stated
initially that he Awould have
to weigh@ the fact that a defendant did not testify in order to defend
himself.  He also stated that he was not
sure he could be impartial because he had often worried about whether his own
children could be molested in day care and he had once dated a woman who had Areally flipped out@ after being assaulted. 








Upon further questioning,
however, Brincks stated that he understood that a defendant has the right not
to testify and that he would follow the court=s instruction not to hold it against appellant if he did not
testify.  In addition, Brincks stated
several times that he could, and would, decide this case based solely on the
evidence he heard in the court room, not based on appellant=s failure to testify or Brincks=s or his friend=s personal
experiences.    After considering all of
Brincks=s answers, we hold that the trial court did not abuse its discretion
or violate appellant=s
constitutional rights by overruling his challenge for cause to Brincks.[47]
 We overrule appellant=s fifth point.

Reasonable Doubt Definition

In his sixth point, appellant
contends that the trial court violated his constitutional right to a fair trial
by submitting the following Areasonable doubt@ instruction
to the jury during the guilt/innocence phase of trial:

It is
not required that the prosecution proves guilt beyond all possible doubt; it is
required that the prosecution=s proof excludes all Areasonable
doubt@
concerning the defendant=s
guilt. 

 

Appellant asserts that this instruction is a
misstatement of the law and should not have been given. 

The court of criminal appeals
has rejected this argument, as have we.[48]  Therefore, we overrule appellant=s sixth point.

 

 

ACommitment@ Questions








In his seventh point,
appellant asserts that the trial court violated his constitutional right to a
fair trial by improperly allowing the prosecutor to ask prospective jurors the
following Acommitment@ questions during voir dire.

[PROSECUTOR]:  Ms. Mendez, how do you think that wouldChow
would that affect a family if that were an accusation that was made involving a
family?

 

. . . .

 

VENIREPERSON
MENDEZ:  Traumatize the family.

 

[PROSECUTOR]:  Okay. 
Make it difficult for everybody involved?

 

VENIREPERSON MENDEZ:  Very much
so. 

 

Appellant contends that these questions were
improper because they detailed the facts of this case and asked Mendez and
other potential jurors to commit to convict in a situation in which one family
member accused another family member of molesting him or her.  We disagree.








Commitment questions are
those that ask a prospective juror to commit to resolving, or to refrain from
resolving, an issue a certain way based on one or more facts contained in the
question.[49]  The challenged questions in this case did not
ask Mendez to commit regarding a conviction, nor did they ask her to resolve or
to refrain from resolving any issues in the case.[50]  Accordingly, we overrule appellant=s seventh point.

Length of Sentence

In his eighth point,
appellant complains that the trial court violated the constitutional
prohibition against cruel and unusual punishment by sentencing him to
ninety-nine years=
confinement.  Although appellant=s sentence is within the statutory range,[51]
he contends that it is grossly disproportionate to the offense committed
because he was convicted on only one count of a six-count indictment, the
evidence showed that he loved B.P. and his family and wanted the best for them,
and his conduct during his presentencing confinement showed that he was
remorseful, was trying to rehabilitate himself, and was trying to help others
avoid similar mistakes.








Generally, punishment assessed
within statutory limits is not excessive, cruel, or unusual.[52]  A narrow exception to this rule is recognized
when the sentence is grossly disproportionate to the offense.[53]








In Solem v. Helm, the
Supreme Court identified three criteria to be used to evaluate the
proportionality of a particular sentence.[54]  They are (1) the gravity of the offense and
the harshness of the punishment, (2) the sentences imposed on other criminals
in the same jurisdiction, and (3) the sentences imposed for the same offense in
other jurisdictions.[55]  In a proportionality analysis, we first make
a threshold comparison of the gravity of the offense against the severity of
the sentence.[56]  We judge the gravity of the offense in light
of the harm caused or threatened to the victim or society and the culpability
of the offender.[57]  Only if we determine that the sentence is
grossly disproportionate to the offense do we consider the remaining Solem
factors.[58]

Appellant was convicted of a
particularly grave offenseCsexually assaulting his twelve-year-old daughter.  It is beyond question that this conduct would
have resulted in tremendous actual and threatened harm to B.P.[59]  Likewise, the potential harm to society
stemming from incest cannot seriously be questioned.








In addition, appellant=s culpability is significant. 
The jury found that he used his sexual organ to contact or penetrate
B.P.=s sexual organ, and it was entitled to consider that B.P. had to
undergo the agony of testifying about the assault and being accused by her
father of lying about it. Finally, although the charged offense, alone, carried
a punishment range of five to ninety-nine years or life,[60]
the jury also found that appellant had two prior felony convictions. Further,
the State put on proof at the punishment phase that appellant previously had
been convicted of five felony offenses.[61]

Based on all of these
factors, we hold that appellant=s ninety-nine-year sentence is not grossly disproportionate to the
offense of which he was convicted.[62]  Accordingly, the trial court did not violate
appellant=s
constitutional rights by imposing the sentence. 
We overrule appellant=s eighth point.

                                            Jury Verdict

In his ninth point, appellant
contends that the trial court violated his constitutional right to a jury trial
by announcing to the jury, after several hours of deliberation, that the jury
was about to be sequestered, thereby coercing a verdict.  

The record shows that the
jury began its deliberations on guilt/innocence at 2:25 p.m. and returned a
verdict at 10:55 p.m.  During that time,
the trial court made one response to a jury note, which appellant does not
challenge.








At the hearing on appellant=s motion for new trial, he testified that he had no knowledge of any
jury breaks.  Appellant further testified
that the trial judge informed everyone in the courtroom that she was
going to sequester the jury. Appellant conceded that this decision was made at
his request.  The jury was not in the
courtroom at the time; the bailiff had gone to get the jury.

After the trial court made
this announcement, she was informed that the jury had reached a verdict.  When the jury returned to the courtroom, some
of the jurors looked upset, tired, or confused. 
Each of the jurors stated during polling, however, that the verdict was
a correct reflection of his or her vote on each count in the indictment. 

This evidence does not show
that the trial court coerced the jury into reaching a verdict by threatening
sequestration.  There are many reasons
why the jurors could have appeared tired, upset, or confused, including the
complexity of the case, the lateness of the hour, and the gravity of the
charged offenses.  Accordingly, we
overrule appellant=s ninth
point.

Request for Severance

In his tenth point, appellant
asserts that the trial court deprived him of a fair trial by denying his motion
to sever the six-count indictment. 
Appellant contends that he had the right to a severance upon
request.  He also complains that the trial
court=s denial of his motion resulted in his character being smeared
generally, prevented him from establishing a defense to the specific
allegations, and may have caused the jury to return a nonunanimous verdict.








A defendant may be prosecuted
in a single criminal action for all offenses arising out of the same criminal
episode.[63]  Whenever two or more offenses have been
consolidated or joined for trial, the defendant has a right to a severance of
the offenses.[64]  The right to a severance does not apply,
however, to aggravated sexual assault offenses committed against a child under
seventeen unless the trial court determines that the defendant would be
unfairly prejudiced by the joinder.[65]  We review a trial court=s ruling on a motion to sever under an abuse of discretion standard.[66]








Evidence of extraneous
offenses committed by the defendant against a child victim is admissible to
show the previous and subsequent relationships between the defendant and the
child and their respective states of mind.[67]  Further, evidence of other crimes may be
admitted if it rebuts a defensive theory, such as appellant=s theory in this case that B.P. had concocted the charges against him.[68]  Thus, even if appellant's cases had been
tried separately, it is probable that evidence regarding the counts on which he
was acquitted would have been admissible to show his and B.P.=s relationship and to refute his defensive theory that B.P. had made
up her allegations because she had been disciplined for receiving poor grades.

Finally, the record shows no
danger that the trial court=s refusal to sever resulted in a nonunanimous verdict.  To the contrary, the jury returned separate,
unanimous verdicts on each of the six counts in the indictment, and, as we have
noted, each juror stated upon polling that the respective verdicts correctly
reflected their votes.  Accordingly, for
all of these reasons, we hold that the trial court did not abuse its discretion
by denying appellant=s motion to
sever.  We overrule appellant=s tenth point.

Conclusion

Having overruled all of
appellant=s points, we
affirm the trial court=s judgment.

PER CURIAM

 

PANEL
F:    CAYCE, C.J.; WALKER and MCCOY, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 








DELIVERED:
September 22, 2005











[1]See Tex. R. App. P. 47.4.





[2]McDuff
v. State, 939 S.W.2d 607, 613 (Tex. Crim. App.), cert.
denied, 522 U.S. 844 (1997); Franks v. State, 90 S.W.3d 771, 789
(Tex. App.CFort
Worth 2002, no pet.). 





[3]Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979);
Ross v. State, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).





[4]Jackson, 443
U.S. at 319, 99 S. Ct. at 2789. 





[5]See Tex. Code Crim. Proc. Ann. art.
38.04 (Vernon 1979); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim.
App. 2000). 





[6]Dewberry
v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert.
denied, 529 U.S. 1131 (2000). 





[7]Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). 





[8]Burden
v. State, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); Kutzner
v. State, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999). 





[9]See Tex. Penal Code Ann. '
22.021(a)(1)(B)(i), (iii), (2)(B) (Vernon Supp. 2004-05).





[10]Tex. Code Crim. Proc. Ann. art.
38.07 (Vernon 2005); West v. State, 121 S.W.3d 95, 111 (Tex. App.CFort
Worth 2003, pet. ref=d).





[11]One
week before the examination would have been April 25, 2003; two weeks before
would have been April 18, 2003.  B.P.
first reported the alleged assaults on April 25, 2003. 





[12]Contrary
to B.P.=s
testimony, G.B. testified that he did not tell the children=s
grandfather.  Appellant suggests that
G.B.=s
testimony is not credible because he could not be precise regarding when he
observed the assault and, from the way the living room was configured, it would
have been impossible for G.B. to observe the assault as he testified.  G.B. testified, however, that the assault
occurred while the children=s mother (appellant=s
wife) was pregnant with their younger sister. 
This time frame is consistent with B.P.=s
testimony. Moreover, appellant does not direct us to any evidence regarding the
configuration of the living room.  G.B.
did not testify regarding the room configuration.





[13]See
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Ross, 133 S.W.3d at 620.





[14]See Tex. Code Crim. Proc. Ann. art.
38.04; Margraves, 34 S.W.3d at 919.





[15]Dewberry, 4
S.W.3d at 740.





[16]Tex. Code Crim. Proc. Ann. art.
40.001 (Vernon Supp. 2004-05).





[17]Wallace
v. State, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003); Keeter
v. State, 74 S.W.3d 31, 36‑37 (Tex. Crim. App. 2002).





[18]Keeter, 74
S.W.3d at 37; Jones v. State, 711 S.W.2d 35, 36 (Tex. Crim. App. 1986). 





[19]Keeter, 74
S.W.3d at 37.





[20]Id.





[21]Id. at 38
(quoting Jones, 711 S.W.2d at 37 n.4). 





[22]Id.





[23]Id.





[24]Conversely,
appellant=s
theory at trial was that B.P. had made up the allegations because she was angry
over being disciplined for a poor report card. 





[25]At
trial, B.P. testified that appellant had asked her to say that her allegations
of sexual assault were not true and that she had only made them because she was
mad at him.  At the new trial hearing,
however, B.P. stated that this trial testimony had been false.





[26]Although
Katrina testified that she planned to divorce appellant, she admitted that she
had visited him five or more times in the two months following his trial,
because AI don=t
kick a person when they=re
down.@ 





[27]See
Keeter, 74 S.W.3d at 37-38.





[28]Tex. R. Evid. 412(b)(2)(A), (C), (E); see
also Tex. R. Evid. 608(b)
(providing that specific instances of conduct may not be used to attack or
support a witness=s
credibility).  The other two exceptions
to these rulesCthe alleged
victim=s
past sexual behavior with the accused and evidence that the victim has been
convicted of a crimeChave
no application to this case.  Tex. R. Evid. 412(b)(2)(B), (D),
608(b).





[29]Tex. R. Evid. 412(b)(3).





[30]Davis
v. Alaska, 415 U.S. 308, 315-17, 94 S. Ct. 1105, 1110-11
(1974); Tex. R. Evid. 613(b).





[31]Carpenter
v. State, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998); Carroll
v. State, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996).





[32]Carpenter, 979
S.W.2d at 634; Lagrone v. State, 942 S.W.2d 602, 613 (Tex. Crim. App.), cert.
denied, 522 U.S. 917 (1997).





[33]Weatherred
v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).





[34]Manning
v. State, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003). 





[35]Id.





[36]There
is conflicting evidence concerning when these events occurred. Katrina
testified that both the letter and the discipline occurred in the summer of
2002, before she became pregnant in October 2002.  Appellant testified that the children were
out of school when he discovered the letter and whipped B.P., but that he and
Katrina met with Larry, his parents, and B.P. regarding the matter during the
very early stages of Katrina=s pregnancy, about a month or
two before B.P. got her poor report card. 
B.P. received that report card in April 2003. 





[37]Appellant
went to jail in August 2003, four months after B.P. made her outcry. 





[38]Hawkins v. State, 135 S.W.3d 72, 77 (Tex. Crim. App.
2004).





[39]Id.; see also Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim. App.
2003), cert. denied, 124 S. Ct. 2837 (2004).





[40]Hawkins, 135 S.W.3d at 77; Mosley v. State,
983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert. denied, 526 U.S. 1070
(1999).





[41]We
discuss these factors in greater detail in our disposition of appellant=s
eighth point, in which he complains of his sentence.





[42]Tex. Code Crim. Proc. Ann. art.
35.16(c)(2) (Vernon Supp. 2004-05); Barajas v. State, 93 S.W.3d 36, 39
(Tex. Crim. App. 2002).





[43]Anderson
v. State, 633 S.W.2d 851, 854 (Tex. Crim. App. 1982).





[44]Id.





[45]See
Moody v. State, 827 S.W.2d 875, 886 (Tex. Crim. App.), cert.
denied, 506 U.S. 839 (1992); Scott v. State, 490 S.W.2d 578, 579
(Tex. Crim. App. 1973).





[46]Anderson, 633
S.W.2d at 854.





[47]See
id.





[48]Woods
v. State, 152 S.W.3d 105, 114-15 (Tex. Crim. App. 2004), cert.
denied, 125 S. Ct. 2295 (2005); Best v. State, 118 S.W.3d 857, 865
(Tex. App.CFort
Worth 2003, no pet.); Vosberg v. State, 80 S.W.3d 320, 323 (Tex. App.CFort
Worth 2002, pet. ref=d).





[49]Standefer
v. State, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001).





[50]See
id. at 180 (stating that AIf the victim is a nun, could
you be fair and impartial?@ is not a commitment
question, but ACould
you consider probation in a case where the victim is a nun?@ is;
only the latter asks for the resolution of an issue in the case); Vrba v.
State, 151 S.W.3d 676, 679 (Tex. App.CWaco 2004, pet. ref=d)
(holding that AWho
thinks that the process of being arrested would be something that might sober
you up a little bit?@ is
not a commitment question).





[51]See Tex. Penal Code Ann. '
12.32(a) (Vernon 2003), '
22.021(e) (Vernon Supp. 2004-05).





[52]See
Jordan v. State, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973); Alvarez
v. State, 63 S.W.3d 578, 580 (Tex. App.CFort Worth 2001, no pet.).





[53]See
Alvarez, 63 S.W.3d at 580; Moore v. State, 54
S.W.3d 529, 542 (Tex. App.CFort Worth 2001, pet. ref=d).





[54]463
U.S. 277, 292, 103 S. Ct. 3001, 3011 (1983), questioned in part by Harmelin
v. Mich., 501 U.S. 957, 111 S. Ct. 2680 (1991).





[55]Id., 103
S. Ct. at 3011; McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir.), cert.
denied, 506 U.S. 849 (1992).





[56]See
Alvarez, 63 S.W.3d at 581; Moore, 54 S.W.3d at
542.





[57]See
Alvarez, 63 S.W.3d at 581; Moore, 54 S.W.3d at
542.





[58]See
Alvarez, 63 S.W.3d at 581.





[59]See
Mathews v. State, 918 S.W.2d 666, 669 (Tex. App.CBeaumont
1996, pet. ref=d) (ACertainly
the great potentiality for mental, emotional, and physical scarring of a sexual
assault victimCa
child of such tender yearsCcannot be seriously
questioned.  Short of murder, we cannot
envision a crime of greater infamy perpetrated against a child . . . .@).





[60]See Tex. Penal Code Ann. '
12.42(a) (Vernon Supp. 2004-05).





[61]The
evidence at punishment showed that appellant previously had been convicted
twice of credit card abuse, once for theft of a person, and twice for
possession of a controlled substance. 





[62]See
Alvarez, 63 S.W.3d at 581.





[63]Tex. Penal Code Ann. '
3.02(a) (Vernon 2003); see id. ' 3.01 (defining Acriminal
episode@ as
the commission of two or more offenses that are the repeated commission of the
same or similar offenses); Tear v. State, 74 S.W.3d 555, 557 (Tex. App.CDallas
2002, pet. ref=d), cert.
denied, 538 U.S. 963 (2003); O=Hara v. State, 837
S.W.2d 139, 142 (Tex. App.CAustin 1992, pet. ref=d)
(both holding that repeated sexual assault offenses against child constitute
same criminal episode for joinder purposes).





[64]Tex. Penal Code Ann. '
3.04(a).





[65]Id. ''
3.03(b)(2), 3.04(c); Matthews v. State, 152 S.W.3d 723, 730 (Tex. App.CTyler
2004, no pet.).





[66]Matthews, 152
S.W.3d at 730; Salazar v. State, 127 S.W.3d 355, 365 (Tex. App.CHouston
[14th Dist.] 2004, pet. ref=d).





[67]Tex. Code Crim. Proc. Ann. art.
38.37, ' 2
(Vernon 2005).





[68]See
Matthews, 152 S.W.3d at 731; Salazar, 127 S.W.3d at
365.